UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 1,210,734.00 USDT,<br><br>Defendant. | **COMPLAINT FOR FORFEITURE *IN REM***<br><br><br>Civil Action No. 26-cv-1988 |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 1, 210,734.00 USDT, hereinafter Defendant Property, and alleges as follows:

### STATEMENT OF THE CASE

1. Criminals abroad, their associates, and conspirators together stole funds from at least four victims and laundered them through a convoluted web of cryptocurrency wallets to evade detection and obfuscate accountability. After stealing those funds, the United States Secret Service ("USSS") Memphis Virtual Currency Task Force used blockchain analysis and other investigative techniques to identify, freeze, and seize the Defendant Property, which constitutes proceeds traceable to those thefts and property involved in, and traceable to, this nefarious wire fraud scheme.

2. The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through

illegal activities; to promote and enhance cooperation among federal and foreign law enforcement agencies; and most importantly, to recover assets that may be used to compensate victims.[1]

## JURISDICTION AND VENUE

3.     This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.     Venue is proper in this court pursuant to 28 U.S.C. §§ 1355(b)(1)(B) and 1395(c) because the property was brought into the District of Columbia.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

5.     The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§1343, and money laundering and money laundering offenses, committed in violation of 18 U.S.C. §1956(a)(1)(B)(i) and (h).

6.     **Wire fraud and conspiracy to commit wire fraud:** 18 U.S.C. §1343 makes it a crime for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.  18 U.S.C. §1349 criminalizes a conspiracy to violate 18 U.S.C. §1343.

7.     **Concealment money laundering and conspiracy:** 18 U.S.C. §1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property

---

[1]     *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.  18 U.S.C. §1956(h) criminalizes a conspiracy to violate 18 U.S.C. §§1956.  The term "specified unlawful activity" is defined in 18 U.S.C. §§1956(c)(7) and 1961(1), and it includes a violation of 18 U.S.C. §1343 (Wire fraud).

## FORFEITURE STATUTES

8.      Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of money laundering offenses in violation of 18 U.S.C. §1956, or any property traceable to such property, is subject to civil forfeiture to the United States.

9.      Pursuant to 18 U.S.C. §981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of that section or any offense constituting specified unlawful activity (as defined in §1956(c)(7) of this title), or a conspiracy to commit such offense, is subject to forfeiture.

## PROPERTY INFORMATION

10.      The Defendant Property consists of 1,210,734.963242 USDT that was held in wallet address identified by 0x076ce1ebfd869bf3b8ddd4280b4a0fd200b0c9a3. The currency together is hereinafter referred to as the "Defendant Property." The address together is hereinafter referred to as "Subject Virtual Currency Address."

11.      The Defendant Funds are in the custody of the U.S. Secret Service in the District of Columbia.

**STATEMENT OF FACTS**

**Background on Cryptocurrency and Virtual Currency Exchanges**

12.    **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computer referred to as "nodes."  Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology.  Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain.  Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data.  There are many different blockchains used by many different virtual currencies.  For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

13.    **Smart contracts** allow developers to create markets, store registries of debts, and move funds in accordance with the instructions provided in the contract's code, without any type of middleman or counterparty controlling a desired or politically motivated outcome, all while using the Ethereum blockchain protocol to maintain transparency.  Smart contract technology is one of Ethereum's distinguishing characteristics and an important tool for companies or individuals executing trades on the Ethereum blockchain.  When engaged, smart contracts automatically execute according to the terms of the contract written into lines of code.  A transaction contemplated by a smart contract occurs on the Ethereum blockchain and is both trackable and irreversible.

14.    **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency.  For example, USDC is a stablecoin pegged to the U.S. dollar.  Stablecoins achieve their

price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

15.    **Tether,** widely known as "USDT," is a blockchain-based cryptocurrency whose tokens in circulation are backed by an equivalent amount of U.S. dollars, making it what is known as a "stablecoin." USDT is issued by Tether Ltd., a company headquartered in Hong Kong.  Tether is connected to Bitfinex, a cryptocurrency exchange registered in the British Virgin Islands.

USDT is hosted on the Ethereum blockchain, among others.  Ethereum ("ETH") is a cryptocurrency that is open source, public, has a blockchain, and is distributed on a platform that uses "smart contract" technology.  The public ledger is the digital trail of the Ethereum blockchain, which allows anyone to track the movement of ETH.

16.    **Virtual currencies** are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (*i.e.,* they can be digitally traded or transferred and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets.  The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users.  Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (*e.g.,* online gaming communities) and generally cannot be exchanged for real currency.  Cryptocurrencies, like Bitcoin and ETH, are types of virtual currencies, which rely on cryptography for security.  Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers.  Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

17.    A **virtual currency address** is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received.  A virtual currency address is associated with a virtual currency wallet.

a.    Like other virtual currencies, USDT is sent to and received from USDT "addresses." A USDT address is somewhat analogous to a bank account number and is represented as a 46-to 48-character-long case-sensitive string of letters and numbers. Users can operate multiple USDT addresses at any given time, with the possibility of using a unique USDT address for every transaction.

b.    Although the identity of an USDT address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular USDT address.  The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.

18.    A **virtual currency wallet** (*e.g.,* a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain.  Multiple virtual currency addresses can be controlled by one wallet.

19.    A **Hardware Wallet:** A hardware wallet is a physical, removable device that stores a user's private keys and can be connected to a computer when a user wishes to use the keys stored on the wallet for virtual currency transactions.  Hardware wallets can be secured with PINs and passphrases and can be backed up or regenerated with a recovery phrase.  Trezor and Ledger are some examples of the types of hardware wallets on the market.

20.    A **Hosted Wallet:** A hosted wallet, also known as a custodial wallet, is a virtual currency wallet through which a third party, *e.g.,* a virtual currency exchange, holds a user's private

6

keys.  The third party maintains the hosted wallet on its platform akin to how a bank maintains a bank account for a customer, allowing the customer to authorize virtual currency transactions involving the hosted wallet only by logging into/engaging with the third party's platform.

21.   A **Multi-Signature Wallet:** Multi-signature (or "multisig") wallets (also sometimes called "multisig vaults" or "safes") require two or more private key signatures to authorize transactions.  Multi-signature wallets requiring more than two private key signatures can be designed so a majority of keys is needed to authorize transactions.

22.   A **Paper Wallet:** A paper wallet is an offline paper record of a virtual currency wallet's public and private keys.  Paper wallets can include barcodes (*e.g.,* a QR code) along with their alphanumeric strings.

23.   A **Software Wallet:** A software wallet is an internet-connected virtual currency wallet in the form of a software application on a desktop or mobile device or a web-based platform accessible through a web browser.  The software will store and usually encrypt the user's publica and private keys.

24.   A **Unhosted Wallet:** An unhosted wallet, also known as a self-hosted or non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency.  Unhosted wallets do not require a third party's involvement (*e.g.,* a virtual currency exchange) to facilitate a transaction involving the wallet.

25.   **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies.  VCEs allows users to exchange their virtual currency for other virtual currencies for fiat currency, and vice versa.  Many VCEs also store their customers' virtual currency addresses in hosted wallets.  VCEs can be centralized (*i.e.,* an entity or organization that facilitates virtual currency trading between parties on

a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (*i.e.,* a peer-to-peer marketplace where transactions occur directly between parties).

26. Transfers of cryptocurrencies are subject to transaction costs. Each blockchain maintains its own manner of paying those costs. Transactions, including transfers conducted on the Ethereum blockchain, incur costs known as "Gas" or Gas fees. Users pay Gas feeds to third parties, called validators, who engage with the Ethereum ecosystem to support the transfer of cryptocurrencies worldwide. For Ethereum transactions, Gas fees must be paid in ETH, the native cryptocurrency of the Ethereum network. This includes transactions involving Ethereum network tokens, such as USDT and USDC, whose outgoing transfers would each require Gas fees to be paid in ETH and cannot be paid using tokens. Therefore, a wallet address would need an ETH balance to initiate sending transaction.

27. Due to the nature of Gas fees, it is common that the payor of the fees is associated with or the owner of individual manager of a particular address who is attempting to initiate the transaction. A simplified analogy is mailing a letter through the U.S. Mail. The postage cost is like the Gas fee in Ethereum. Just as an individual must pay the postage to send a letter, an individual transacting on the Ethereum network must pay a Gas fee. Moreover, given that a letter is sent using postage that a sender commonly pays for, the postage can be presumed to be sent or associated with the mailer. The same logic holds in cryptocurrency transactions, where transferors typically pay fees associated with transfers. With Gas fees, however, the postage is more like a digital footprint, in that it cannot be changed or manipulated in any way.

### Background on Crypto Confidence Fraud Schemes

41. A Crypto Confidence Fraud Scheme, also known as "Pig Butchering," is a type of cryptocurrency-related investment, or confidence scam, that convinces victims to invest in

cryptocurrency through non-existent cryptocurrency trading platforms. Crypto confidence schemes are predominantly based in Southeast Asia. These criminal organizations often use forced labor by means of human trafficked victims to perpetuate the crime globally.[2] The victims of these schemes are referred to as "pigs," by the perpetrators because the scammers will "fatten up" victims into believing they are involved in a legitimate investment.

28.    The scammer typically initiates contact through social media platforms and eventually forms a relationship with the victim to grow trust. Those relationships may be perceived by the victims as romantic, professional, or friendship based. The scammers often create profiles using fictitious names, locations, images, and personas, allowing the scammers to cultivate personal relationships with prospective victims. The scammers promise a lucrative return on investment, by manipulating an increase in balance to the victim's account on their fraudulent domain. The scammers also provide falsified transaction photos that depict that scammers are contributing their own funds to the victim's initial investment. Often enticed by the falsified returns, the victims continue to invest until they try to retrieve their gains, only to find that they are unable to retrieve them. The scam continues by the scammers demanding additional payments be made to the platform for their investments to be released and/or withdrawn. Examples include victims being required to pay an additional percentage to the fraudulent platform in order to guarantee the funds, prepay taxes on the balance, or pay a fee/fine due to suspicious money laundering activities.

29.    The "butchering" or "slaughtering" refers to the victims once their assets are stolen, often causing the victims financial and emotional ruin.

30.    Perpetrators of crypto-confidence fraud schemes are highly effective in gaining an

---

[2]    *FinCEN Alert* issued September 8, 2023, FinCEN Alert on Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering" *(FIN-2023-Alert005, pg. 1-2.)*

individual's trust and/or affection in a short amount of time using manipulative tactics and language. A single crypto confidence fraud scheme is often facilitated by multiple individuals with different roles and responsibilities. This is true of its operation in that there are registrants, developers, and controllers of these domains, that are prepared in advance to be used by the scammer prior to and throughout the lifecycle of victim engagement. The criminal syndicate commingles, consolidates, and coordinates their post-fraud money laundering activities of illicit victim proceeds linked to crypto confidence schemes.

31.     The 2023 FBI Internet Crime Report, reported, "In 2023, the losses reported due to Investment scams became the most of any crime type tracked. Investment fraud losses rose from $3.31 billion in 2022 to $4.57 billion in 2023, a 38% increase. Within these numbers, investment fraud with reference to cryptocurrency rose from $2.57 billion in 2022 to $3.96 billion in 2023, an increase of 53%. These scams are designed to entice those targeted with the promise of lucrative returns on their investments."[3] Crypto confidence fraud scams are included in Investment scams and the losses reported.

**Summary**

32.     On or about April 27, 2023, a victim of a crypto confidence fraud scheme (named here as "LI") reported that he had been defrauded into sending over $197,000 in cryptocurrency to multiple receiving addresses that turned out to be scam websites[4]

33.     In or around February 2023, LI received an unsolicited text message at his phone number while he was in California. A female, who called herself Lu Sen "LU," stated that she

---

[3]     *Source* - Federal Bureau of Investigation – Internet Crime Report 2023 – Internet Crime Complaint Center ("IC3"), at 12

[4]     As described below, not all the $197,000 was transferred to the SUBJECT VIRTUAL CURRENCY ADDRESS.

had seen a real estate post with his cell phone information and wanted to discuss investments. Shortly thereafter, other scammers also contacted LI via text message with the ruse of attempting to contact old friends and service providers such as doctors and restaurants. LI said the scammers stressed the fact that they all believed fate brought them together and the scammers and LI quickly became friendly. The scammers asked LI to switch the chats to the Telegram app, which LI did. Once the communications were moved to Telegram, the scammers began convincing LI into investing in cryptocurrency. LI stated they were all very knowledgeable in cryptocurrency investment opportunities. During many of the conversations, the scammers would share snapshots of their fake lives to help sell the scam.

34.     After becoming friendly with the scammers, LI was encouraged to download multiple links to what law enforcement now know are fraudulent crypto exchanges. At the time, LI thought these were legitimate crypto exchanges. The scammers urged LI to invest quickly so that he would not miss out on "rare investment" opportunities. The scammers described the investments as "contracts" that have different profit margins. When the prices of the assets were expected to go up, the scammers would urge LI to buy, and when the prices of the assets were expected to go down, the scammers told LI they would sell. LI believed that these contracts would typically range from 30 seconds to one (1) hour with an expected return of 20% to 60%, which would encourage LI to have to move quickly to buy or sell. The scammers emphasized that the investment decisions were trade secrets and should not be shared with anyone else. Over the course of the fraudulent activity, between March 8, 2023, and April 24, 2023, LI sent approximately 14 separate wire transfers from his bank to Crypto.com in the amount of $197,000. LI then sent the money from Crypto.com to wallets at the instruction of the perpetrators.

35.     After a few investments, LI withdrew small amounts from each of the trading platforms to verify that the withdrawal process would be done successfully and in a timely manner.  However, when LI attempted to withdraw his profits, the fake exchanges would post additional rules to prevent the funds from being withdrawn.

36.     In one example (as part of the fourteen separate wire transfers mentioned above), the fictious exchange BitBay froze LI's account and asked LI to deposit the same amount as his initial deposit, approximately $80,000, within three days to prove that LI was not money laundering.  BitBay told LI that if he did not deposit the $80,000 they would turn LI into the regulatory authorities for investigation.

37.     In another example, the fictious exchange SGXPro wanted LI to pay the taxes on his earnings before any funds could be withdrawn.  LI was told this was "profit tax," which he was told was different from taxes paid to the US government.

38.     LI advised investigators that, he deposited a portion of his funds, approximately $75,000,     via     crypto.com,     across     three     separate     wires     to 0x09dd2e2234e99eb10c913647a7f08fbfcaa597ee ("597ee").  LI's deposits were as follows: $9,803.11 on March 8, 2023; $24,364.76 on March 22, 2023; and $40,000 on April 14, 2023. Investigators traced funds from 597ee to SUBJECT VIRTUAL CURRENCY ADDRESS where the funds remain.  The lowest intermediate balance rule ("LIBR") is a forensic accounting method used to trace commingled funds.  It assumes that the owner of a commingled account spends his own money before spending the other funds.  It is reasonable to apply the LIBR theory in this case to conclude that the funds in the SUBJECT VIRTUAL CURRENCY ADDRESS include victim funds, including those of LI.

**The Movement of Funds to SUBJECT VIRTUAL CURRENCY ADDRESS**

39.     Law enforcement identified approximately 18 USDT addresses involved in the movement of funds.  The USDT addresses are referenced as intermediary addresses, that are addresses through which the funds passed on their way to their ultimate destination, in this case, the SUBJECT VIRTUAL CURRENCY ADDRESS where the funds remain.

40.     The flows of funds Cam Address 597ee to the SUBJECT VIRTUAL CURRENCY ADDRESS showed several unique indications that those transactions originated from a crypto confidence fraud scheme and other frauds.  For instance, the numerous intermediary addresses used to funnel funds from Scam Address 597ee to the SUBJECT VIRTUAL CURRENCY ADDRESS were established in a condensed time frame: between March 2023 and October 2023. The accounts exhibited large dollar deposit transactions, followed by a pattern of rapid movement of funds with large corresponding withdrawals.  Five of the wallets in the flows are receiving and sending transactions worth over $100 million in cryptocurrency.  Two of the intermediate addresses along the flows were analyzed by law enforcement. Address 0x3e5c4bd6df896547b8b2b876f0f1f89d574775da (75da), sent and received approximately $18,000,000. 75da funded SUBJECT VIRTUAL CURRENCY ADDRESS with approximately $500,000.  Additionally,  0xa7409e71aba3d2b106946025157a3e0234404a92 (4a92), sent and received approximately $72,000,000. 4a92 funded SUBJECT VIRTURAL CURRENCY ADDRESS with approximately $160,000.  These two wallets interact directly with SUBJECT VIRTUAL CURRENCY ADDRESS.  Based on blockchain analysis, these two wallets combined have sent $700,000 in proceeds from victims to SUBJECT VIRTUAL CURRENCY ADDRESS.  These proceeds were evaluated to come from victims based on the funds' transfer through wallets associated with pig butchering based on blockchain and other open-source intelligence, including software provided by a company to analyze blockchains.

41.    Criminals will often conduct an otherwise unnecessary (if the transactions were legitimate) and costly number of transactions in the transfer of funds to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds.    The large number of rapid transfers—with no apparent business purpose—in transactions throughout this case is a strong indication that the movement of funds was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity (in this case, wire fraud).

42.    The chart below indicates the following:

a.    Between March 8 and May 6, 2023, there were a series of transactions from an address associated with Crypto.com to 597ee – the address to which LI was directed. In particular,

1.    On March 8 around 23:00, the equivalent of around $9,798 was transferred by LI from an address associated with Crypto.com to 597ee
2.    On March 22 around 19:17, the equivalent of around $24,743 was transferred by LI from an address associated with Crypto.com 597ee.
3.    On April 14 around 17:01, the equivalent of around $40,390 was transferred by LI from an address associated with Crypto.com to 597ee.

b.    On May 8, 2023, around 3:53 AM, the equivalent of around $157,541 was transferred from           address           597ee           to           address 0XE57c612D965866c8964e58656Ac315111aA1E564 ("0XE57c6"). As indicated below, a sum close to this amount would shortly be transferred from 0xE57c6 to the SUBJECT VIRTUAL CURRENCY ADDRESS.

c.    On May 9, 2023, around 8:45 AM, the equivalent of around USD $150,124 was transferred from 0xE57c6 to the SUBJECT VIRTUAL CURRENCY ADDRESS.

**Graph 1 – Summary flow of funds from LI and other suspected victim(s) [5] to SUBJECT VIRTUAL CURRENCY ADDRESS**

---

[5]    The transfer of $146,279 on May 6, 2023, is from another suspected victim(s) of a pig butchering scheme.

**Additional Victim Proceeds traced to SUBJECT VIRTUAL CURRENCY ADDRES**

40.    Law enforcement identified four victims (Victims 1 ("LI"), 2, 3, and 4, as further described below) from virtual currency exchanges Kraken, Coinbase, and Uphold, who sent approximately $400,000 to wallets identified by open-source intelligence (which has been found to be reliable in the past) as "Pig Butchering Group 15" and "iceleo[.] pig butchering group" ("Iceleo Pig Butchering Group").

42.    Based on reports to and/or interviews by law enforcement, each of these victims (Victims 1, 2, 3, and 4) described circumstances similar to typical crypto-confidence schemes or "pig butchering"; that is, each withdrew and sent funds in cryptocurrencies as purported investment opportunities as directed by unknown subjects they met online, and then were unable to obtain their funds back.

43.    As set forth below, both groups are related, that is, they appear to have obtained funds from victims of crypto confidence schemes/pig butchering, and moved the funds into the same blockchain addresses, indicating an overlap in the groups themselves and/or use of the same addresses to launder the proceeds.  Pig Butchering Group 15 deposited $500,000 of these victim funds directly to SUBJECT VIRTUAL CURRENCY ADDRESS, where they remain.  Iceleo Pig Butchering Group deposited $160,000 of victim funds directly to SUBJECT VIRTUAL CURRENCY ADDRESS where they remain.

44.    Iceleo    Pig    Butchering    Group    is    associated    with    address 0xA7409e71abA3d2B106946025157a3e0234404a92. Based on analysis of blockchains, this address has sent and received the equivalent of over $36,000,000 between September 18, 2021, and May 23, 2024.

16

45.    Pig    Butchering    Group    15    is    associated    with    address

0x3e5c4Bd6Df896547B8B2b876f0f1F89d574775dA.  Based on analyses of blockchains, the

address has sent and received the equivalent of over $9,000,000 between September 25,2023,

and November 23, 2023.

46.    Law enforcement spoke with Victim 2, a resident of Virginia, who stated that he was

contacted on Facebook where he became friends with an individual.  This individual suggested

Victim 2 invest in cryptocurrency.  Victim 2 was told to utilize a domain (later deemed

fraudulent) provided by the scammers.  Victim 2 made five withdrawals totaling approximately

$450k to invest in cryptocurrency, with approximately $$50k going to SUBJECT VIRTUAL

CURRENCY ADDRESS. Victims 3 and 4 withdrew approximately $700k, with $470k going to

SUBJECT VIRTUAL CURRENCY ADDRESS.  As with Victim 1 (LI), the movement of funds

indicates multiple hops (intermediate transactional steps of short duration) in condensed time

frames, ending in SUBJECT VIRTUAL CURRENCY ADDRESS.

47.    The chart below indicates the following:

   a.  On May 22, 2023, around 21:00, the equivalent of around $166,686
       (which had been deposited by Victim 4) was transferred out of an address
       associated with Coinbase, and moved through a series of transfers on May
       22, May 27, and May 29 through eight intermediate wallets until, on May
       29, 2023, and around 9:04 AM, the equivalent of around $160,856.82 was
       transferred   from   0xA7409e71abA3d2B106946025157a3e0234404a92
       (associated  with  Iceleo  Pig  Butchering  Group)  to  the  SUBJECT
       VIRTUAL CURRENCY ADDRESS. It should be noted that 4 of the
       wallets along the flows, or hops, have known scam activity as reported by
       community and TRM attribution.

   b.  On September 29, 2023, around 20:10, the equivalent of around $100,558
       (which had been deposited by Victim 3) was transferred from an address
       associated with Uphold and moved through a series of transfers on
       September 29 and September 30 until, on October 1 around 6:15 am, the
       equivalent   of   $500,042.20   was   transferred   from
       0x3e5c4Bd6Df896547B8B2b876f0f1F89d574775dA (associated with
       Pig Butchering Group 15) to the SUBJECT VIRTUAL CURRENCY

ADDRESS. Additionally, not depicted in the graph below, law enforcement noticed that Victim 3 made an initial deposit of $100k on September 29 and subsequently received $50k back on October 1. This is typical in Pig Butchering schemes where victims will initially receive a portion of their "investment" back giving them confidence to deposit more funds into the scammer wallets. After Victim 3 received this $50k deposit they made the next two withdrawals to the scammer's wallets in excess of $600k.

c. On August 21, 2023 around 15:48, the equivalent of around $99,155 (which had been deposited by Victim 2) was transferred from an address associated with Kraken and moved through a series of transfers on August 21 through four intermediate wallets until, on August 24, 2023, around 14:40, the equivalent of around $49,974.41 was transferred from 0x7Bcfa777b78bdbc17405E0607E67141A676D6749 to the SUBJECT VIRTUAL CURRENCY ADDRESS.



**Summary of USDT in SUBJECT VIRTUAL CURRENCY ADDRESS**

48.     Of the 1,210,734.96 USDT in SUBJECT VIRTUAL CURRENCY ADDRESS, approximately 550,000 USDT—or approximately 45%—has been traced to crypto confidence fraud scams.   Furthermore, multiple suspected victim funds pass through known wallets associated with crypto confidence fraud scams, which all consolidate at the SUBJECT VIRTUAL CURRENCY ADDRESS.   It is reasonable to attribute these wallets to crypto confidence fraud scams based on IC3 reports, victim reports, and partner network data collection. The flows to the SUBJECT VIRTUAL CURRENCY ADDRESS show indicia of the scam activity, such as numerous hops (*i.e.*, brief movements through intermediary addresses/wallets) in short periods of time consistent with layering during timeframes in which known crypto confidence fraud schemes were occurring.   Additionally, there is no economic or legitimate reason to transfer virtual currency through multiple addresses due to Gas fees that must be paid with each transaction.

49.     On December 11, 2024, and at the Government's request, Tether executed a blocking action on SUBJECT VIRTUAL CURRENCY ADDRESS. As a result, no funds have been deposited into or withdrawn to or from SUBJECT VIRTUAL CURRENCY ADDRESS since that date.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(C))

50.    The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

51.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. §981(a)(1)(A))

52.    The Defendant Property constitutes property involved domestic and international concealment money laundering transactions committed in violation of Title 18, U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), and a conspiracy to engage in money laundering, committed in violation of Title 18, U.S.C. §1956(h).

53.    Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

## CONCLUSION

54.    The SUBJECT VIRTUAL CURRENCY ADDRESS functioned as an avenue to launder funds linked to crypto confidence fraud schemes.  Through these addresses, perpetrators funneled funds to addresses they controlled, namely SUBJECT VIRTUAL CURRENCY ADDRESS. The perpetrators known and unknown co-conspirators collected the proceeds of their crimes in SUBJECT VIRTUAL CURRENCY ADDRESS with other funds for the purpose of concealing the origin of the dirty funds and to streamline their laundering operation. Therefore, the property is subject to forfeiture.

21

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

*/s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

## VERIFICATION

I, Morgan Morgan, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this ___6th___ the day of __April__ 2026.

Morgan Morgan
Special Agent
United States Secret Service